# JOSEPH F. GERLACH *vs.* CARROLL E. WARREN.

## *Contract—Fraudulent Alteration—Evidence.*

A contract for the sale of property on instalment payments, having been executed in duplicate, but the buyer having lost his duplicate copy, *held* that the evidence of several persons as to the contents of the lost duplicate, as well as the appearance of the duplicate retained by the seller, justified a decree that a clause, appearing at the close of the latter duplicate, was not in the contract as executed.

*Decided January 14th, 1925.*

Appeal from the Circuit Court of Baltimore City (STEIN, J.).

Bill by Carroll E. Warren against Joseph F. Gerlach to restrain the prosecution of an ejectment suit. From a decree for plaintiff, defendant appeals. Affirmed.

The cause was argued before PATTISON, ADKINS, OFFUTT, DIGGES, BOND, and PARKE, JJ.

*Henry H. Dinneen,* with whom was *Harry M. Benzinger* on the brief, for the appellant.

*Robert C. McKee* and *Morton Y. Bullock,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appellee, Carroll E. Warren, was on the first day of June, 1918, a tenant of the leasehold premises known as 5002 Palmer Avenue, in the City of Baltimore, and was then, and had been for several years prior thereto, paying as rent therefor to its owner, the appellant, Joseph F. Gerlach, the sum of fifteen dollars a month. On the date above mentioned Warren purchased the property so occupied by him from Gerlach at and for one thousand dollars, of which sum one hundred dollars was paid in cash and the balance ($900) was to be paid in monthly installments of twenty dollars, commencing with the first day of June, 1918. From the payments, so to be made, were to be deducted the interest on the purchase money, and a sufficient amount to cover taxes, ground rent, water rent and insurance on the property from the date of the agreement; and when the amounts so paid, after the deductions aforesaid, amounted to nine hundred dollars, the balance of the purchase money, the property was to be assigned or conveyed to the appellee by the appellant. There was to be an adjustment every twelve months, at which time Gerlach was to deduct from the aggregate amount paid during the preceding twelve months the interest on the

amount of purchase money owing at the beginning of said term, as well as all taxes, ground rent, etc., paid by him during said time, and the balance was to be credited on the purchase money. And if Warren, for two consecutive months, failed to pay the monthly installments as the same became due and payable, then the agreement with all its provisions, and covenants, was to be null and void at the option of Gerlach, and all money paid by Warren thereafter, if he were permitted to remain in possession of the property, was to be considered as rent, such rent however not to exceed twenty dollars per month.

The above provisions were contained in a written contract, executed in duplicate, and in the hand writing of Gerlach. The duplicates, when written by Gerlach, were carried by him to the home of Warren, where they were compared, Gerlach reading one of them while Warren and his wife, with the other, followed him in his reading. After the comparison was so made the contract, as we have said, was executed in duplicate, and either on that day, or at a later time, one of the duplicates was given by Gerlach to Warren and the other was retained by him, and thereafter Warren made his monthly payments upon the purchase money in accordance with the terms of the agreement.

In November, 1919, when Warren was to meet Gerlach for an adjustment, as provided by the agreement, the June meeting of 1919 having been deferred to such time at the request of Gerlach, Warren, to get his duplicate, went to the drawer of the bureau where, only a few months before, he had placed it, but was unable to find it. Whereupon he at once told Gerlach of its loss, and called upon him for a copy of the duplicate in his possession, but it was not until March, 1920, after repeated demands had been made upon him, that he furnished, at the request of Warren's attorneys, what purported to be a copy of such duplicate.

Until told by Warren that he had lost his duplicate, Gerlach had regularly called at Warren's home for the payment

·of the monthly installments, but thereafter Gerlach ceased to come for them, and Warren carried the money to Gerlach.

In February, 1920, Gerlach told him he would not receive from him any more of the monthly payments, but that he would sell the property to him for one thousand, two hundred and fifty dollars. Warren having lost his duplicate of the contract and not knowing what might be the effect or result of its loss in an effort to enforce it, considered the proposition to buy the property at the new price named by Gerlach, and, by appointment, met Gerlach at the court house in Baltimore City, where they discussed the purchase of the property, and it was suggested that the execution of the duplicate held by Gerlach should be acknowledged by them, and that such duplicate, with the acknowledgment appended thereto, should be placed upon record.

A notary was procured, who wrote an acknowledgment upon the duplicate, but before acknowledging it, Warren asked to be permitted to read the duplicate, and upon reading it, he observed, at the end of it, a clause which he said was not in either of the duplicates at the time of their execution, and of which he, until then, had no knowledge whatever. The following is the clause mentioned:

"It is agreed and understood between the parties hereto that the party of the first part shall have the right to cancel this contract any time providing he refunds one hundred (100) dollars and all money paid over expenses and interest."

After discovering that the duplicate contained the above ·clause Warren refused to acknowledge its execution, and, as shown by the original duplicate produced at the argument, lines were drawn through the acknowledgment so written by the notary.

It was after the meeting above referred to at the court house that Gerlach furnished the copy of the duplicate held by him; and although he had said on February, 1920, that he would not thereafter receive from Warren any more of the monthly payments, he continued to receive them until

July, 1920, the last one received by him being on the 21st
day of July of that year, and in the receipt given by him for
that payment it is stated that it was "on account, purchase,"
which was the language used in many of the preceding re-
ceipts for such monthly payments.

After the last named date Warren continued to send the
monthly installments to Gerlach until June 6th, 1923, when
he received a letter from Gerlach's attorney, saying:

"Under your agreement with Joseph F. Gerlach
dated June 1, 1918, Mr. Gerlach is privileged to cancel
that contract and repossess the property No. 5002
Palmer Avenue at any time upon repayment to you
of the sum of one hundred dollars, plus the net differ-
ence between the sums paid by you in installments, and
the expenses and interest on the principal of one
thousand dollars.

"Mr. Gerlach now desires to repossess this property,
and I wish you would arrange an appointment, so that
we can strike a balance, and thus determine exactly
how much is due.

"Under the circumstances, no more payments of
twenty dollars per month will be accepted by Mr.
Gerlach."

As there was no adjustment of the matter as suggested by
the above letter, and as Warren remained in possession of
the property, Gerlach, on the 25th day of June, 1920,
brought an action of ejectment in the Baltimore City Court
against Warren to eject him from the property.

It was then that Warren applied to the Circuit Court of
Baltimore City for an injunction restraining Gerlach from
the further prosecution of his suit in ejectment.

The court, after hearing testimony upon the bill and
answer filed, granted the injunction as prayed. From that
decree Gerlach has appealed to this Court.

The only question in this case is, Did the contract when
executed contain the provision above set out giving to Ger-
lach the right to cancel the contract upon the terms therein
stated, notwithstanding Warren should fully comply with

the other provisions of the contract therein previously contained?

Warren testified that in June, 1918, Gerlach came to his home—5002 Palmer Avenue—and said to him that he, Warren, "would either have to buy or move from the property" he then occupied as a tenant of Gerlach, as "he was going to sell." "We talked it over and he, Gerlach, said he would draw up an agreement and bring it down and we could study over it, and he brought the agreement down some time after that"; that when he brought it to his home "he, Gerlach, read over one copy and we (he and his wife), followed on with the other one," and he and his wife a number of times, thereafter, read the duplicate that was left with him; That the last clause in it was that the party of the second part (Warren) had the right to alter and repair the property, and, as he remembered, about three inches below that was the name of Gerlach, and beneath Gerlach's name was his own name; and that the clause at the end of the contract giving Gerlach the right to cancel it was not in the contract at such time. He also testified that shortly after his duplicate or copy was left in the house, he carried it to his uncle, John W. Warren, who was president of a building and loan association and who was familiar with the essentials of such a contract, and had him read it over in his presence; after which his uncle discussed some of its features with him. He further stated that Mrs. Thomas, his wife's sister, was at his house, though not in the same room with them, on the occasion when Gerlach left the duplicate at Warren's home and that she too read it over.

Mrs. Warren, wife of Carroll E. Warren, the appellant, testified that she was present when Gerlach brought the contract prepared by him to their home, it was in duplicate, and when asked, Did you read it at the time before it was signed? she replied, "Yes, all together. Q. How do you mean all together? A. Mr. Gerlach held one contract and my husband and I read the other one as he read it over." At that time, she said, the papers were alike, what he read from his was on

them. Mrs. Warren too testified that her sister, Mrs.
Thomas, was at their home on the occasion referred to by
her husband, and that she, Mrs. Thomas, after Gerlach had
left, read the contract or duplicate left with them. She also
testified that she saw and read said duplicate at least a dozen
times before it was lost. She, as well as her husband, speaks
of her signing the duplicates, but as shown by the one pro-
duced by Gerlach, they meant thereby that she *witnessed* the
signatures of the parties, Gerlach and Warren.

When asked about the clause permitting Gerlach to cancel
the contract, she said it "was not in it at all"; that when she
signed it his name was two, or two and one-half, inches
below the written matter in the contract; that the last provi-
sion in the contract, when she read it, was the right of her
husband to alter or make repairs. As shown by the duplicate
produced by Gerlach, the last line of the clause which per-
mitted him to cancel the contract, which concludes the
written matter of the contract, is on a line with Gerlach's
signature thereto, the last word of which is not more than
one-half inch from the beginning of his signature, and not
more than one-half inch above the name of Mrs. Warren,
which is on the left side of the paper, little below the signa-
ture of Gerlach's.

Mrs. Thomas, the sister of Mrs. Warren, testified that she
was at Warren's house on the occasion when Gerlach left
there one of the duplicates of the contract, and that she, after
Gerlach left, read the paper; that she recalled that the last
thing in it at that time was the clause allowing Warren to
make alterations or repairs. She also spoke of the extent of
space between the writing in the contract and the signatures
of the parties, but this applied only to the copy or duplicate
left with Warren, as she did not see the other, but this was
not so with Mr. and Mrs. Warren, for they saw, and either
signed or witnessed, both duplicates.

John W. Warren, uncle of the appellee, testified that for
twelve years he had been president of the Pimlico Building
Association, and had bought a number of pieces of property

on his own account. He also testified that Carroll E. Warren brought to him his duplicate of the contract made with Gerlach, and asked him to examine it, which he did very carefully, and he recalled that it concluded with the clause that Warren should have the right to alter and repair the property mentioned therein. This clause he discussed with the appellee and told him of the advantage of it to him.

He was then asked if he recalled seeing therein the clause now in the duplicate produced by Gerlach permitting him to cancel the contract at any time. His reply was "I don't know anything about that. That was not in the contract that I read."

Gerlach testified he had been in the real estate business for thirty years. He bought and sold property and was the owner of a great deal of property in the City of Baltimore. He stated that Warren was expecting to be drafted in the army and worried about the increase of rent to which his family might be subjected in his absence, and wanted some assurance from him that the rent would not be increased. Gerlach told him it would not be increased, but Warren wanted assurance in writing, and to do this he wrote in duplicate the contract already mentioned. The duplicates, as he said, were signed by him and Warren, and one left with the latter. He admitted that he was told by Warren that he had lost his duplicate of the contract and was asked by him several times for a copy of it before one was furnished him. When asked why he did not give the copy to Warren, he said, "I was undecided then, I did not know why they should be so anxious to get a copy." The court then asked him what was his reason for cancelling the contract and he replied, "Well, I had the privilege, that is the reason. Q. Is that the only reason? A. Yes. Q. Isn't the property worth more now than in 1918? A. Yes, sure it is. Q. That is your reason, isn't it? A. Yes. Q. Isn't it true that in 1918 property was very cheap when the contract was signed? A. That property was worth then about $1,400 or $1,500 then. Q. Why did you sell it for $1,000 then?

A. I really did not expect to dispose of this property. The intentions at that time was to insure him against raising the rent. He thought he might be drafted in the army and he was worried about my raising the rent. Q. At no time did you ever expect to give him the property, is that right? A. Well, I might have given it to him if property had not advanced so much. I am satisfied now to give it to him at a reasonable figure. Q. What is a reasonable figure? A. I figure that property is worth three thousand five hundred dollars now. Q. Why didn't you give him a lease instead of a purchase agreement? A. I guess I could have done that but I would not have had five months rent in advance." It will be observed that, although he says that the paper prepared by him, which is in the nature and form of an outright sale, was given to assure Warren that the rent would not be increased, yet by said paper the rent was increased five dollars per month. The appellant concluded his testimony by saying that the duplicate retained by him was exactly like the one he gave Warren.

Upon a careful consideration of the evidence in this case, we cannot escape the conclusion that the clause found in the paper produced by Gerlach, by which he was permitted to cancel at any time said contract made between the parties, even though Warren complied in every way with all the terms and conditions preceding it, was not in the contract at the time of its execution.

It is true, as contended by counsel of Gerlach, that such determination should be reached only upon clear and convincing evidence, but such evidence we think is found in the record.

No less than four persons, who read the duplicate left with Warren, testified in language most positive that the clause in question was not in it; and not only does Warren and his wife, who saw, and either signed or witnessed, both duplicates, testify that the duplicate left with them was like the one retained by Gerlach, but Gerlach himself says that the two were alike when he gave one of them to Warren. War-

ren and his wife were afforded the opportunity of seeing the paper that was retained by Gerlach, and had a mind picture of its appearance at such time, which they disclosed to the court in their evidence. Their names, as well as the name of Gerlach, when placed thereon, were much further from the written matter of the contract than they now appear upon the paper produced by Gerlach. In it Gerlach's signature is practically on a line with the last line of writing in the contract, with hardly enough room between it and the edge of the paper for his name to be written, although when placed thereon there was a blank space below it of more than three and one-half inches. These facts strongly support the positive assertions of the appellee's witnesses that the clause in question was not in the contract when it was executed.

Against this evidence is the evidence of Gerlach alone. This we will not discuss but, after giving it all the credence and weight to which it is entitled, we think it is sufficiently shown that the clause in question was not in the contract at the time of its execution. We will, therefore, affirm the decree of the lower court.

*Decree affirmed, with costs.*